Mr. Olsen for the petitioner, Mr. DeMille Wagner for the respondent. Good morning, Judge Henderson is not here this morning, not able to be here. She will consider these cases based on the audio recording of the oral argument. You may proceed. Thank you, Your Honor. May it please the Court. The overarching and grievous separation of powers problem presented by the CFPB arises in the context of an astonishingly capricious and unlawful agency decision. The director ran roughshod over clear provisions of federal law, rewriting Section 8 of RESPA to prohibit conduct expressly authorized by that law, disregarded and retroactively overruled decades of administrative and judicial application of that law and widespread industry reliance on it, dismissed and distorted a plainly applicable statute of limitations contrary to authoritative judicial decisions, and imposed draconian remedial punishment that Congress did not give or authorize to that Bureau under these circumstances. The context of this case is the rewriting of RESPA, a statute that addresses payments that might be made or might not be made at settlements and real estate transactions. The issue is Section 8 of that statute. Section 8 specifically authorizes the transactions that were taking place here, and the director of the CFPB wrote that statute, Section C-2, out of the statute completely. As we pointed out, the agency and the predecessor agency, the Housing and Urban Development, had consistently construed that statute in policy statements, in interpretations, in a regulation, something called Reg X. Courts had interpreted that provision as authorizing the payment of fees under real estate settlement circumstances for services actually rendered. Bonafide payment for services actually rendered. The director of the CFPB wrote that statute out of existence and pretended it didn't exist at all, overriding industry reliance on those interpretations that had taken place for decades. So that's one of the violations, of clear violations of federal law, that the director implemented in his decision. Secondly, so it was a misconstruction of Section 8, that Section 8C-2. Secondly, it was an overturning reasonable, relied upon expectations of the industry regulated that it depended upon, relied upon, and pursued and followed the agency's direction over decades, and unsettled expectations that have been based upon substantial reliance. As this court knows, as the Supreme Court has frequently said, the Due Process Clause requires that an individual have the opportunity to know the conduct that will be prohibited or will be permitted. What the agency did here was make an abrupt turn, a complete 180 with respect to the interpretation of the statute, giving no warning whatsoever. So the imposition of this $109 million substantial penalty took place in the context of a clear rewriting of the statute and an overturning of settled expectations. The agency went on then, and to the statute of limitations, and I'm only going to have time to mention a few of the ways which we've elaborated in our briefs, that this director of the CFPB ignored statutes, rewrote statutes, changed things on the spot with respect to the decision. The statute of limitations in Section 8, and it clearly says proceedings for violation of this section, Section 8, shall be subjected to a three-year statute of limitations. That's clearly in the statute, 2614. And the director ignored that statute of limitations and basically said, because I'm bringing an action in an administrative capacity, I can ignore that statute of limitations and pretend it completely doesn't exist. Then on top of throwing out that statute of limitations, which is clearly in the statute, clearly applicable to alleged violations of Section 8, the director then went on to decide that instead of the clearly judicially recognized interpretation of the statute of limitations, which is in the Snow decision, which is mentioned in the brief, which the ALJ and the proceeding below recognized as a judicially binding interpretation, then said the violation, if one occurs, isn't when the deal was closed, at the closing of the transaction, when the reinsurance, which is what is involved in this case, was issued, but instead, every time subsequently, a premium was paid, thus multiplying the decision of the administrative law judge, which was a 6.7 million, no, 6.4. May I back you up a little bit about the statute of limitations? Yes. Let's suppose you're wrong that it's not clearly applicable and that it applies only to courts. That doesn't end the analysis, though, does it? If this were a federal court case and there was no statute of limitations since the 1800s, what the federal courts do is borrow a statute of limitations, the principle being that there has to be something. There has to be some statute of limitations. So there's a clear statute. The statute that's also clear is a candidate for borrowing. Do you know of any administrative law case where there's no statute of limitations and the administrative agency therefore borrows either a state statute of limitations or an analogous federal statute of limitations? Well, I can't think of an administrative law case. The Supreme Court dealt with this, of course, in the securities field when it overturned the borrowing of state statutes and borrowed a federal securities law statute. That's the Lamp v. Cleaver case in the Supreme Court of the United States. The courts have been borrowing state statutes of limitations, which resulted in uneven application of statutes of limitations of the securities laws. And so the Supreme Court found that another borrowing under statute of limitations in the securities law was the right thing to do. But the point was, and I think this is consistent with what the thrust of your question is, Your Honor, there's got to be a statute of limitations. But here, Section 8D is quite clear that you bring an action for violations that is described in 8D, and then Section 2614 describes the statute of limitations. In clear language, it says any action brought pursuant to Section 8. Now, and 8D is the one that says for violations, you bring an action. So the director and his agency brought an action, and then Section 2614 prescribes a three-year statute of limitations. But it was compounded. The administrative law judge specifically said we're bound by the decision in Snow, which says that a violation, if one occurs, occurs at the closing of the transaction. And that's when the so-called violation of RESPA occurred. That's when the referral fee, if it's illegal, would have occurred. But instead, the director looked beyond that to every premium that was ever paid, inconsistent with decisions of this Court, that says that you don't construe, even if there was an ambiguity, which there isn't here, you wouldn't construe a statute of limitations to vastly expand the limitations period and vastly expand the amount of the penalty or damage that might occur with respect to the limitations period. There are several cases from this circuit and throughout the United States that stand for that proposition. And it's important to remember here that this is a criminal statute. The Supreme Court just a few years ago, in the Freeman v. Wickham loans case, addressed a separate provision of RESPA. And this was a unanimous decision written by Justice Scalia that pointed out that this is a criminal statute, the rule of lenity applies, so that any ambiguities whatsoever must be construed in favor of the party against whom penalties would be assessed. So that was another violation of clear law. And then when the director went to a statute that says he has the power, this is AD, the power to bring an action to enjoin violations, then threw that limitation out and decided that we could impose a discouragement penalty, which multiplied what the ALJ did from $6 million to $109 million. And then there's an injunction, as this court knows, there's an injunction that basically says, don't violate the law and goes beyond the notice of violations. These are just some of the... Let me just back you up because you've got a lot. We'll give you time, of course, to cover everything. Thank you. And we'll give both sides time to cover everything. But to back you up to the beginning here on your constitutional argument, I think their response is, well, what's the difference between a single-headed independent agency and a multi-member commission that we've historically had? What's the problem? Why draw the line there? Well, one of the obvious differences... Let me say that the separation of powers and checks and balances problems with respect to this statute are multiple. Not only are there restrictions on the president's removal power, but to get to your question, it is vested in a single individual. At least in Humphrey's executor, the power was dispersed. And you know all the reasons why that case is different than this case. That was quasi-legislative, quasi-judicial. And the Supreme Court said in the Free Enterprise Fund, we're basically going to limit that case to the type of circumstances in that case. The vice of putting all of that power instead of separating it is the same thing that happens here. When you have to make a decision, there are three of you, or at least two of you, or if it's an en banc, a wider number. The decision-making power is dispersed among individuals. Here it is concentrated in a single individual. The president doesn't have any control to remove that individual. Well, if the president did, then it would be constitutional. Pardon me? If the president did have that power to remove, not restricted by cause. No, Your Honor, because there are so many other problems with the creation of this agency. It doesn't have to go to Congress for its funding. It takes its money out of the Federal Reserve without an appropriation of Congress. It has the power to write its own rules and regulations. It has the power, irregarding other federal laws, to hire and fire people and set people's salaries. It doesn't have to go through the Office of Management and Budget with respect to proposed regulations, as every other agency does. In connection with communications with Congress, the president can't say we want to know what you're proposing with respect to proposed legislation. I may be wrong about this, but I thought in free enterprise, the accounting agency did not go to Congress either. I thought their finances were paid by the fees of the people they were regulating. Yes, and I think that that's not an insignificant concern. But when you have it all piled together in an agency like this, you could take these things one at a time. But here, the president and the Congress have no control over this agency. You have a super executive agency with the power to bring actions like this. The only check on this agency is right here. If it isn't for the judiciary, this agency can do anything it wants. It can interpret statutes. It can impose penalties such as this. And we saw here where the statutes were being ignored. Statute limitations were being ignored. Limitations on its remedial powers were being ignored. Penalties, out of the blue, disregarding previous administrative decisions, were set aside. I could go on and on, but there is no what's the remedy. The remedy is that this agency is unconstitutional. First of all, it's exceedingly important that I hope that the court will address the substantive, factual issues of RESPA that were violated here. It's very, very important because this is an entire industry that's listening to what's happening here today. But the bottom line, to answer your question, Judge Calderon, is that this agency is unconstitutional. The decisions of this director in this case have to be overturned. This decision has to be vacated. I hesitate to go any further than that because if I were in your shoes, I might be very, very tempted to write an opinion and would be entirely justified that Congress cannot create an agency like this that ignores all of the rules with respect to separation of powers. As many scholars have pointed out and many judges of this court and the Supreme Court have pointed out, the separation of powers is what protects our liberty as individuals in this country. And we can write all sorts of Bill of Rights on parchment, but it's the separation of powers. And it goes right back to the Federalist Papers. The very definition of tyranny is to concentrate all powers, legislative, judicial, and executive, in a single agency. This agency has more power, I submit, than any other agency ever created by Congress. If the only issue were fair notice, which is the lead argument that you make, at least the first argument you make, what's the remedy for lack of fair notices to make this decision prospective of? Well, it would be to vacate this decision with respect to... I submit that if it was only that, you could decide that, well, this agency has the power to make that interpretation of the statute disregarding everything that came before. But everything that came before was an interpretation of the statute, a criminal statute. And I submit that just making it prospective wouldn't solve the problem, because the agency doesn't have the power to reach this interpretation of the statute. She's looking for that HUD letter and all the surrounding activity with respect to that, when the matter was with HUD, that it was a rule within the meaning of the APA? It was a rule in the sense... The reason I ask that, Mr. Olson, is that if it were a rule, then it couldn't be overturned by adjudication. It would have to be done by rulemaking. It can't. The HUD letter, in and of itself, wasn't a rule. But the interpretation of the statute was embodied in court decisions and in other interpretations. There's communications back and forth from Congress with respect to the Culpeper decision of the 11th Circuit, where Congress said, can you imagine what's going on here? And that ultimately got corrected. I do believe that an adjudicative decision can overturn a rule if it's arbitrary and capricious and against the law, which is this was. So there's no way you can read Section C and specifically C2 of Section 8, which says, notwithstanding any other provision of this section, it shall not be prohibited to do X. This is a part of the statute. So any rule that comes to an opposite decision is arbitrary, capricious, and in violation of the law. Now, I don't want to abuse the courtesy that you've extended to me. I do think, in summary, and I hope, I presume I have the five minutes I was asking for rebuttal. In summary, this is an unprecedented, unconstitutional agency that has more power than Congress and the President put together. If there ever wasn't an agency created by Congress that violated separation of powers, this is it. And the perfect example of what happens when that kind of an agency is created is this decision, where rule after rule, statute after statute, interpretation after interpretation is thrown out of the book, and all of a sudden an agency that's been relying on those interpretations is fined. This disgorgement remedy wasn't permitted. And by the way, there's many things wrong with the disgorgement remedy because they just took all the premiums. They didn't deduct any profit. It wasn't profit. I could go on and on. So everything about this decision, the legal interpretation, the remedy, the statute of limitations, everything else is wrong. This is a decision that is riddled through with legal, capricious errors. Thank you. May it please the court, since counsel for PHH ended with a constitutional issue, I'll begin there. Their primary argument with respect to the constitutionality is that the Bureau is unconstitutional because its director can be removed only for cause. In that, the Bureau's for cause removal provision is no different from the for cause removal provision that applies to the Federal Trade Commission. But they're commissions. That's the difference. Historically, independent agencies have been multi-member on the theory that they're nonpartisan or bipartisan. This is a novel structure with very few precedents that I've found, and almost none that are historical, very few in recent years. There are a few, Your Honor. The Social Security Administration went back 20 years. By the way, when that was created, President Clinton issued a signing statement saying there are severe constitutional problems with that agency. Yes, but he didn't explain what those constitutional problems were, and President Obama didn't indicate that there were any constitutional problems with respect to the Bureau. I'm just pointing out there are very few precedents here. And the reason for the commission structure was that this is an exception or a difference from the usual control the President has over the executive branch. And if we're going to have that kind of structure, we want it to be a group that's going to be nonpartisan or bipartisan. You can't have that with a single person. You're concentrating on a single person, a huge amount of power, and the President has no authority over that. I assume the current director can serve out his or her term regardless of what the next president wants in terms of consumer financial protection, right? Unless removed for cause, Your Honor. Right. Yes, but as the Supreme Court noted in the free enterprise case, one of the concerns is diffusion of power. Diffusion of power leads to diffusion of accountability. Diffusion of power from the President. The President is the person who Article II assigns the sole power to run the executive branch. Humphrey's executor is a historical exception to that, which we accept, of course, but it's always been commissions. It's always been multi-member bodies with very rare exception, and the reason for that, as I articulated, is the liberty reason, because it's very dangerous in our system to put such huge power in a single person. But, Your Honor. Whether it's courts, whether it's independent agencies. But, Your Honor, in free enterprise, the court touted the virtue of a clear chain of command. There's no clearer chain of command than there is here with respect to the Bureau. All decisions of the Bureau are the responsibility of the director. But that adds to the problem from the perspective of free enterprise fund, not help it, because the clear chain of command was to the President, who was elected by the people, and was in turn accountable to the people. That was the theory in free enterprise fund. But here, the clear chain of command is also to the President. So, could Congress tomorrow make the FCC and the FCC and the Federal Trade Commission all headed by one person? Could Congress say the FCC is now going to be headed by one person, and the FCC is going to be headed by one person, and the Federal Trade Commission is going to be headed by one person, and the NLRB is going to be one person? That certainly isn't an issue that we've addressed in this case, but Congress has made the Social Security Administration headed by one commissioner. The Office of Special Counsel is headed by a special counsel. The Federal Housing Finance Administration is headed by one director. Congress has made agencies headed by a wide variety of constructions. The old Interstate Commerce Commission, for many years, was headed by 11 commissioners. There are many commissions that are headed by five-member commissions. The NCUA, the National Credit Union, NCUA is headed by three members. Congress has its choice, and yes, it can create an agency headed by one commissioner, because the President's authority to remove is very important, but courts have held that it is not illimitable. But nonetheless, the President has sufficient control when he has the power to remove. Now, PHH here complains that the Bureau is headed by one director, but at page 48 of their brief, they also complain that the Bureau is hydra-headed. The Bureau is headed by one director, Richard Cordray. I saw him last week. He's not hydra-headed. There is no constitutional problem in constructing the Bureau this way, nor is there a problem that the Bureau is funded outside the appropriations process. Many other agencies are funded. On that issue, you're right. There are a number of agencies who have that. On the single-headed independent agency, not so much. Not so many. Not so many. But the concern, there should be no concern there, because the President has sufficient control when he has the power to remove,  I don't understand that. You already said the next President, this President, if they don't agree with the direction of the agency, it's being too lenient. They want to push harder. It's being too aggressive. They think it should be more prudent. You're saying the President can't change for that reason? The Director Cordray's term expires in early 2018, and at that point, the new President will be free to appoint whoever he chooses. It's an unusual structure. You cited the ones I found as well. Are there any other examples? We found no others, sir. And PHH also suggests that because of a wide variety of other factors, they refer to in their brief that the Bureau is somehow, the Court should take a holistic approach to the constitutionality of the Bureau, and consider a wide variety of factors. I know of no case that supports this holistic, I know it when I see it, approach to the unconstitutionality of an administrative agency. The Bureau structure is not so different from the Federal Trade Commission, which was upheld by, whose structure was upheld by the Court. Now, on the question we asked in the order, I assume your preferred remedy, if there is a problem, is to sever the foreclause, or am I wrong about that? No, that would be our preferred remedy, would be to sever the foreclause. That's the remedy that this Court has applied in other situations where it's discovered a similar problem, and to relay the matter to the Commission, to the Bureau, rather, for consideration by a Bureau with a Director who is, at that point, removable foreclause. The recovery, the disgorgement, some million dollars, who gets that? That goes to the Treasury, Your Honor. That goes to the government. And it's a totally appropriate award here because, over the years, PHH received hundreds of millions of dollars in connection with this kickback arrangement that it set up. Now, it contends that it did not have fair notice that its conduct would violate RESPA. This Court has explained in the Park-Towlitz v. Perk case that agencies may, in administrative adjudications, clarify ambiguous statutes and then apply those interpretations retroactively. But the agencies here, the relevant agencies, have issued definitive statements saying that this activity was legal, and there were repeated statements saying as much. No, Your Honor, and I'll go through them one by one. The number one statement they rely on is that 1997 HUD staff letter regarding reinsurance. It's at page 251 of the joint appendix. Right there on page 1 of that letter, in the middle of the page, it says that a mortgage insurer may purchase reinsurance from a lender if the payments are solely for reinsurance. The problem for PHH here is that the payments it was receiving from the mortgage insurers were not solely for reinsurance. They were quid pro quo for referrals, and the quid pro quo, that's exactly what RESPA seeks to prohibit, kickbacks for referrals of real estate settlement service. PHH, in its brief, two times or three times, cites a paragraph on page 3 of that letter. It's a one-sentence paragraph kind of in the middle of the page. I think if they read that paragraph very carefully, if they parsed the words, if they picked up elements of style and understood the back of it. You're asking them to do something. The entire industry had the opposite reading of it confirmed repeatedly by HUD. In the treatises, everyone understood what the deal was. If you want to change it going forward, we can talk about the statutory issue, whether you have authority to do that. But to pull the plug, change it going backwards is very problematic, at least under the Supreme Court's presence. Okay, explain why it doesn't mean what I think it means. Well, you can parse through that paragraph, pick up the elements of style and realize that that is a defining pronoun. But forget the grammar lesson here. I want the grammar lesson. What is that? That is a defining pronoun there, and it indicates, as the letter does in the very next paragraph, which they don't get down to, but the very next paragraph says that it's okay if the lender's affiliate, lender's reinsurance affiliate, actually performs reinsurance services and the compensation that it receives is bona fide and does not exceed the value of the reinsurance. Two things that are required of the compensation. It must be bona fide and not exceed the value of the reinsurance. The director explained the meaning of bona fide, and in fact, his explanation was consistent with the Supreme Court in McDonald v. Thompson at 305 U.S., page 263 of page 266. Supreme Court explained that to determine whether a business operation is bona fide, you have to determine whether it's conducted for purposes of evasion. Here, PHH set up this reinsurance affiliate atrium solely for the purpose of getting kickbacks to get around the restriction of Section 8A of RESPA. Section 8A of RESPA clearly prohibits kickbacks for referrals, so PHH asks this court to interpret Section 8C2 to allow it to pay kickbacks as long as it sets them up as payments for goods or facilities or services. But correct me if I'm wrong, everyone was doing this. Many people were because it was very possible. Because you think they were just, oh, it's blatantly illegal, we're just going to do it anyway. I mean, I just don't think that was going on throughout the industry. They thought, they asked, and maybe they didn't parse the grammar correctly, but there was a widespread understanding, wasn't it, that this was legal? It certainly was a widespread practice. It was very profitable for them, Your Honor, as this case shows, but whether they knew it was legal, there was nothing in that letter that indicated that HUD would have said that it was okay for parties to enter into agreements or understanding requiring the payment of kickbacks. But was there any indication before this decision that this widespread practice that was going on throughout the industry and seemingly, I understand your point, but seemingly blessed by agency positions was somehow viewed as illegal? It was never blessed by agency positions. Put that aside. Was there anything that said actually this arrangement is illegal before the director's decision? Because nobody ever suggested to HUD. Nobody ever raised the question with HUD, well, we're going to enter into an agreement requiring the payment of kickbacks for reinsurance, but we're going to set it up. We're going to set it up so that the payment is equal to the value of what we're providing. What's your definition of a kickback? A kickback is exactly what happened here. No, no, no, I mean in general. And kickbacks in many other parts of the economy are not legal. I wash your hands, you wash mine. If somebody is providing a service at fair market values, can that be a kickback? Yes, it absolutely can, Your Honor, and here's a good example. Why? Why? Because imagine that any company making referrals in the real estate business simply went out and just bought at wholesale a warehouse full of Xerox paper and then told the company receiving the referrals, every time we make a referral to you, you've got to buy a pallet of Xerox paper at retail price. That's a very profitable business for the company making referrals. That's a kickback. It distorts the market. The problem here is with respect to mortgage insurance, borrowers don't shop for it. They're dependent on lenders to refer them. The lender isn't going to try and make the best decision for the borrower. The lender is going to try and make the best decision for the lender, and that's why the practice went on in the industry. All the lenders saw that mortgage insurers were making big bucks as the housing industry boomed, and they wanted to get in on it. So they set up these captive reinsurance businesses. The question was fair market value, right? Yes. So once they get fair market value. In my example with the Xerox paper, they sold the Xerox paper. They bought it wholesale. They sold it retail. They made a lot of money out of it. The mere fact that it's fair market value doesn't mean they're not getting kickback. The burden of your position is then that but for the arrangement, the insurers would not have purchased reinsurance. They absolutely would not have, Your Honor, and that was the evidence in the case. We cited in our brief a mortgage insurance executive testified and explained that they didn't want the reinsurance, but they had to buy it because they lost the referrals. That's the only reason they bought it. If they had really wanted reinsurance, there would have been a market out there, companies like Lloyd's of London, Swiss Reinsurance. There would have been others out there who were not captive reinsurers. There would have been other reinsurers out there offering the product to mortgage lenders, but they weren't, and the reason Lloyd's of London couldn't sell reinsurance was because Lloyd's of London couldn't give referrals, which is what the mortgage insurers wanted. The mortgage insurers depend on referrals for their business. Borrowers, as I said, do not select the mortgage insurer. There's no gecko out there marketing mortgage insurance to consumers. Borrowers don't even know how to shop for mortgage insurance. The problem for you, you talked about 8A, but on the statute itself, 8C2. 8C2? Nothing in this section, nothing. Nothing in this section shall be construed to prohibit any person from accepting a bona fide payment for goods or facilities or services actually provided or performed. The director, in his decision, recognizes that this provision is ambiguous. He actually said it's not entirely clear as to what the provision means. Bona fide means in good faith. Bona fide, as the Supreme Court explained, means not for evasion, and as Regulation X explains in a provision that we include in the addendum to our red brief that, I don't know if you still get red briefs, but addendum at page addendum 6, it's a provision that's currently codified at 12 CFR 1024.5B7. The regulation explains that to determine whether a mortgage transfer is bona fide, you look to the real interest of the parties. The real interest of the parties here is kickbacks for referrals. Is there anything like that interpretation of bona fide in the prior agency pronouncements on this subject? The other agency pronouncements that actually, and no, with respect to the HUD letter, one thing I didn't say about that is that HUD specifically cautioned in its regulations in a provision that we include in the addendum to our brief at page 4, HUD specifically cautioned that informal staff letters, such as this HUD letter that were never published in the Federal Register, do not provide a defense to liability. We include HUD's regulation in there. HUD had it at 24 CFR 3500.4B. Letters such as this one do not provide a defense to liability, but PHH also claims that it relies on more formal HUD policy statements that were, in fact, published in the Federal Register. The problem for PHH with respect to the statements that were published in the Federal Register is that none of them deals with a situation where there was a clear agreement between the parties to require the payment of kickbacks for referrals. All of those policy statements deal with, and they're all very similar, they deal with slightly different factual permutations, but the logic of them is... The Supreme Court case law on the fair notice does not require some formal regulation. It's as if the police officer says you can cross the street here and then when you get to the other side, the officer gives you a $1,000 ticket. That's what it seems like happened here, which is you had this, and there are subsequent letters, this blessing to go ahead, and then it's $109 million. It's not a blessing to go ahead. It's a letter that HUD cautioned not to rely on, and we don't know what the incoming for that letter was. We don't know what Countrywide described and what HUD did there. They didn't say, but just kidding. They didn't say, but just kidding. When you say don't rely on this, that's the vernacular for that is just kidding. No, no, no, Your Honor. That's not what that is. HUD received a letter from Countrywide, and we don't know what Countrywide said, but presumably if HUD tried to sue Countrywide, that letter might be a defense for Countrywide. Regulated parties frequently approach agencies, and agencies can respond to their practices without providing a formal pronouncement or statement of policy. Here, the statement of policy, none of them involves a situation where there's a clear agreement between the parties to require the payment of kickbacks for referral. What they do deal with instead is they explain when HUD would infer a violation based solely on the price paid by the party that had received referrals for services that it was purchasing from the party that made referrals. When HUD would infer a violation based on the price. Here, we don't need to infer an agreement, because there is clear evidence in the record, and it's described in the director's opinion at pages four and five. It's four and five in the joint appendix. It describes the evidence that showed that there was a clear agreement. The mortgage insurers understood that if they didn't buy the reinsurance, they were off of PHH's data. There was an example in there showing where a mortgage insurer said, we're no longer buying the reinsurance, and immediately its referrals were cut more than 99%, and then later on it said, okay, we've changed our mind. We're going to buy reinsurance again. Six minutes later, the instruction goes to put that company back on PHH's favored list. Why isn't the most natural reading of bone five equivalent to fair market value? Because, Your Honor, if you read it that way, it renders section 8C1. Sir Flossage is the director. Explain. Redundancies. Congress is often redundant in covering the waterfront and making sure things are either prohibited or exempt when they're doing things like that. That's very common. When that statute says for services actually provided, and it says that in a number of places, without the use of the modifier bonafide, it says it in section 8B. 8B becomes virtually immutable. But if you didn't have bonafide, then you could have salaries or compensation that weren't fair market value and try to get exempt. The reason Congress presumably put bonafide in was to ensure that it reflected a real salary, real compensation, which is usually determined by fair market value. No, Your Honor. Section 8B, for example, which prohibits splits of real estate charges, says splitting a fee for a settlement service violates RESPA except for services actually provided. There's no bonafide. They don't use the words bonafide in that section. Your interpretation might suggest that if one party could receive a split so long as it provided nothing more than a peppercorn's worth of services, that can't be right. That would render that provision virtually, would render that meaning absurd. There's no justification for that. Your Honor, there are more than 110 cases that repeat the Supreme Court's admonition that when interpreting statutory provisions, it's simply inappropriate to extract an elephant from a mousetrap. Congress does not hide elephants and mousetraps, but that's what PHH is asking this court to do. It's asking it to interpret Section 8C2 of RESPA to undermine, completely undermine a central purpose of the act, the prohibition of kickbacks. What was the evidence regarding the cost of not re-insurance, but insurance by the companies that were dealing with PHH? Was it higher than other ones? No. Well, yes and no, Your Honor. No, in that there is evidence that the costs in the industry were more or less the same, but two things. One, everybody was doing it. So everybody's, you know, all prices, all boats rose as the water rose there. But two, there was some evidence, which we cite in our brief, that PHH was starting to get, I believe it's by 2011, they were beginning to get complaints from borrowers who said, yeah, you're referring us to mortgage insurance companies, but we did actually do a little due diligence here, and we did find mortgage insurers who were less expensive. Why weren't you referring us to those mortgage insurers? And I guess there's a third piece of evidence here, and that is that PHH not only originated loans, it also bought loans from other lenders. It referred to them as its correspondent lenders. It packaged these and it sold them in the secondary market. If one of those loans required mortgage insurance, and if the correspondent lender, the borrower, whatever, didn't get mortgage insurance from one of PHH's favored mortgage insurers, PHH upped the rate on that loan. It charged a certain percentage more, a substantial percentage more with respect to the rate of that loan. That seems to indicate that there's certain, not only is there real value in that, but that there were cheaper prices out there. The evidence is a little mixed on that point. But regulation... Who's getting protected by the director's decision? If it's not the borrowers, because the cost of insurance is fairly uniform, who is getting protected by this decision? Your Honor, ultimately it is the borrowers. In this specific case, there simply isn't evidence that the borrowers paid a higher price because that's not required. In the regulations, currently at 1024.14G2, it says it is irrelevant in determining whether there's a violation to identify that there's actually been a price increase to borrowers. But the fact of the matter is, Your Honor, kickbacks are inherently market distorting. In this market, with respect to the reinsurance, everything was so badly distorted as it was because everybody was doing the same thing. So there simply wasn't clear evidence because everybody was paying a higher price. So we can't compare a pristine market with the distorted market. Do you want to talk about the statute of limitations in particular? Is there one? Could something like this be brought 20 years after the fact, 30 years after the fact? No, Your Honor, there is no statute of limitations with respect to... So you can bring this as far in the future and go back as far as you want? The Consumer Financial Protection Act authorizes the Bureau to pursue cases in court or administratively. The provision in Section 1054, which I believe is at 12 U.S.C. 5564, says with respect to court actions, there is a statute of limitations. There is no statute of limitations provision in the Bureau's authority to bring administrative actions. And the Bureau's work... How common is it for there to be no statute of limitations for an agency to seek major sanctions like this? Your Honor, I can't say that I know for sure, but I do know that there's no statute of limitations in the Federal Trade Commission's authority to bring administrative adjudications. And I believe this was modeled after one of the banking acts, which also has no statute of limitations here. PHH... Now here, we're not challenging anything that happened 20 years ago. The Director can't... I know, I'm talking about, as we must do, what your theory would allow. We can't just think about this case. Your theory would allow the agency, the Director, the single Director, to go back decades. I'm not saying this will happen often, but this is one way to think about it. Go back decades and impose major liability on someone for something that happened a long time ago, which we don't usually see. There is no statute of limitations in the provision, and I would note that with respect to statute of limitations... There was a statute... I mean, provisions before the Bureau was created, there was a statute of limitations when HUD enforced. Yes, because HUD had no choice except to... HUD had no choice except to bring actions in court. And if the Bureau brought an action to enforce in court, it would also be subject to that same three-year statute of limitations. But Congress amended RESPA to allow the Bureau to enforce it. It passed the Consumer Financial Protection Act. It could have amended RESPA to provide that the statute of limitations also applied in administrative adjudications, but it didn't. How do you distinguish the long line of cases that I mentioned to Mr. Olson dating back to the early 1800s, that when there's a judicial action brought by a federal official and the governing statute does not have a statute of limitations that the courts borrow either a state statute of limitation or a federal one? I can't think of all the names of the cases, but they do date back to the 1800s, and the court says it would be an abomination to have a federal official not bound by a statute to be allowed to bring an action decades after the event. I think, Your Honor, perhaps that if the Bureau tried to do that at some point, the court could address that issue as to whether the Bureau's action had crossed the abomination threshold. But it doesn't here, because P&H even concedes that the Bureau can pursue conduct going back as far as January 2009. They only dispute that between July. It has an effect on the amount of liability, does it not? It has some impact, yes. But they calculate liability differently than we do. They contend that liability attaches only when loans close. But that's simply wrong, and the reason that's wrong is because that's not the way P&H set it up in its contracts with the reinsurers. All four of the contracts between P&H and the reinsurers are in the record in this case. They're not in the joint appendix, but they're in the record. And none of those contracts makes any mention of closing whatsoever. However, what they all do provide is that every quarter, the mortgage insurers are required to do an accounting to determine how much they received in premiums from borrowers who were referred by P&H during that preceding quarter, and then pay over a percentage of that to P&H. The director found that every time P&H accepted one of those payments, it violated RESPA because RESPA said that no person shall accept any fee, kickback, or thing of value pursuant to an agreement or understanding, oral or otherwise, that business, incident, or to or part of a real estate settlement service shall be referred. That's what happened. On the statute of limitations, are you aware of why Congress might, under your view, have wanted no statute of limitations on administrative actions? I don't know of any legislative history with respect to that. There are no statements from anyone acknowledging and expressing support for this discrepancy? Not that I know of, Your Honor. There is a statute of limitations on court proceedings. Under your view, there's none on administrative. The Consumer Financial Protection Act adopts and adapts sections from a variety of other acts. And as I said, agencies like the Federal Trade Commission have no statute of limitations with respect to their administrative proceedings. Can they collect fines? Can they collect forfeitures? Can they collect civil penalties? They actually can collect fines if they can show that the practice they have and it's under Section, I believe it's 5M of the FTC Act. They can. They have to. They have to go to court. They have to go to court. They have to show that they're. There is a statute of limitations. It's 28 U.S.C. 2462 that covers it. It covers every agency in the federal government unless Congress provides otherwise. And silence has never been construed as providing otherwise. Otherwise the statute would make no sense, right? But in the BP America case, which we cited in our brief, the court there distinguished on that general statute of limitations, it distinguished between court actions and administrative proceedings, and it said that that provision, that statute of limitations provision does. What, in your view, is the reason for a statute of limitations? There can be lots of reasons for a statute of limitations. Give me three. Give you three? Yeah. It can be that there's difficulty obtaining evidence. Again, this has not been part of the case. Evidence becomes stale. People forget. People forget. Yes. Which one of those reasons doesn't apply to an administrative agency? They all might apply to an administrative agency, Your Honor. So why would Congress put a statute of limitations only on a judicial proceeding and not on one within the agency? But that's what Congress did, Your Honor. That's what it did. That's the question, isn't it? Whether it did. Yes. I suppose so, Your Honor. But the fact is that it is quite conspicuous that there is a statute of limitations in the provision dealing with court proceedings, and there is no statute of limitations in the section dealing with administrative proceedings. On congressional intent again, the original idea for this, then Professor Warren proposed an idea for a consumer, for a financial product safety commission. It was going to be a commission as originally proposed. Do you know why Congress changed that idea from a multi-member commission to a single director? I do not, Your Honor. I haven't researched that point. But the fact is that a single-member agency remains constitutional. It is a choice. As I said, Congress has structured various agencies in various different ways. Social Security Administration, one commissioner. NCOA, three. Federal Trade Commission, five. The old ICC, 11. That was Congress's choice with respect to this specific agency. Now, PHH has suggested that because RESPA can be criminally enforced, this court must interpret all ambiguity in its favor applying the rule of lenity. But this court and the Supreme Court have both said that the rule of lenity applies only if after considering the text, the structure, the context, the purpose of a statute, grievous ambiguity remains. The director... Well, but footnote 9 of Chevron says that we're supposed to use all the tools of construction before we go to step 2. And the rule of lenity is one of those tools of construction, correct? I would say it's a rule of construction that applies after all the other rules have been applied, except, Your Honor, I would note that this court... But footnote 9 of Chevron talked about the traditional tools of construction, and the rule of lenity, as Justice Scalia most prominently has said many times, the rule of lenity is foundational. But this court has said in 2012 in United States v. Burwell, you only apply the rule of lenity if grievous ambiguity remains. And this court recognized that there are a few statutes out there that do have ambiguous provisions in them, that ambiguity itself is not enough to... So Judge Sutton's opinion, you disagree with that? I do, Your Honor, I do disagree with Judge Sutton's opinion. And I think it would have real consequences here. The Consumer Financial Protection Act directs the Bureau to enforce 18 consumer financial laws. Eight of those laws can be criminally enforced, including the Truth in Lending Act, the Fair Credit Reporting Act, the Electronic Funds Transfer Act, the Interstate Land Sales Act, Fair Credit Billing Act. Some courts hold that all of these statutes have to be interpreted to achieve their remedial purpose, but no court holds that these statutes have to be all strictly construed in favor of defendants. And, in fact, in Warning v. Family Publications, a Supreme Court case, where the Supreme Court was asked to consider the Truth in Lending Act, and, again, that's one of the statutes that the Bureau enforces, and it can also be criminally enforced. The Supreme Court rejected an argument that Truth in Lending had to be strictly interpreted because it could be criminally enforced. Instead, the agency deferred to the reasonable interpretation of the agency... There was an argument in Warning about the rule of validity? I argued the case, but I don't recall it. In Warning, there was a discussion in the opinion about the rule of validity. Yes, there was, Your Honor. There was a discussion about whether the... I'm not sure that the words, rule of lenity, ever applied. Were used, but there definitely was a discussion as to whether the statute had to be strictly construed because it could be criminally enforced, and the court absolutely rejected that argument. But the reason for that is that it's fundamentally unfair, due process-type concern, to interpret an ambiguity in a criminal statute or a statute that can be criminally enforced against an individual's foundational individual liberty. An ambiguity is not going to be used against you. But in this case, in United States v. Cansionalic, that was a criminal case where this court had to determine whether certain restrictions in the FECA applied to soft money. The court rejected application. It's a criminal case. Rejected application of the rule of lenity and instead applied the agency's interpretation cited to Chevron and to the Supreme Court's case in Babbitt v. Sweet Home, which we cite in our brief. The director correctly held that PHH violated the Real Estate Settlement Procedures Act, had ample authority to impose injunctive relief and discouragement here. And with respect to this discouragement, granted it's a substantial discouragement award, but this is money that PHH, a multibillion-dollar company, wrongly received and has had the use of for many, many years. The enforcement authority in your agency, you don't have to go to court to enforce an order? Is that correct? I believe we would, Your Honor. To enforce our orders, I believe we would. Okay, you're not like the NLRB, though, that you need an enforcement order from the Court of Appeals before anybody before Senate. I don't believe so, Your Honor. I may be incorrect on that. If so, I'll correct it after that order. But so we would ask this court to, I see I've gone over my time, but we would ask this court to uphold the director's decision and to affirm it. Thank you. Thank you. Mr. Olson, we'll give you five minutes for rebuttal. Thank you, Your Honor. Let me start with Frayman v. Quicken Loans. That is a unanimous decision of the United States Supreme Court on the subject of Section 8 of RESPA. It's a 2002 opinion, unanimous. It says a number of things. First of all, RESPA is a criminal statute, and the rule of lenity applies to interpretation of the statute. And the court was very, very clear about that because the agency, the person supporting the interpretation of RESPA that was rejected by the Supreme Court, was saying, well, the purpose of RESPA is to do certain various different things. And Justice Scalia made it very clear that RESPA specifically prohibits certain specific acts and not other things. And he said specifically, this is a very, very poor case to bring up the purpose of the statute. It's a criminal statute. It has to be narrowly construed. We've heard our opponent use the word kickback a number of times, a score of times here during this argument. It must be 30 or 40 or 50 times in the brief that they filed. What we're talking about here is a specific statute that says something must be prohibited. Section C-2 specifically says nothing in this section, nothing in this section shall be construed as prohibiting a fee for actual services, compensation for actual services rendered. That's clearly in the statute. They're putting a lot on bonafide. Pardon me? They're putting a lot of weight on bonafide. They're putting a tremendous amount of weight on bonafide. But it was that the agency did explain in the HUD letter, which was to a lender, which they understood was going out to the industry, being followed by the industry. It's picked up in Reg X. Reg X specifically says, refers to that provision, and this is at CFR 102.14, specifically says with respect to that, if the reasonable relationship in the market value of the goods or services provided, then the excess, if there's no reasonable relationship to the market value, then the excess, so this Reg X, which was interpreted by the Shutey Court and the Glover Court, so it's not just agency interpretations, it's industry understanding and reliance, it's communications back and forth with Congress after that Culpepper case, it's the 11th Circuit and the 9th Circuit that interpreted, it's Reg X, it goes on and on and on. It wasn't any question. There was no understanding anywhere out there that the interpretation that the director came up with in this proceeding would be the interpretation of the statute. Now, we're told that, well, we have something in that letter that says, don't trust us. That's as if the agency would put, you said, well, don't believe us, or take your own chances. It's as if the agency put on this door, they might as well put on this door of this agency, don't believe anything that we say, that when the agency came into existence and specifically put out a regulation saying it would adopt the previous policies and petitions and interpretations of the agencies that it superseded, and that included HUD, and that included this statute, and here there is no showing that there's any excess of anything beyond a reasonable relationship with the fair market value. I thought there was an alternative holding. The alternative holding... It disappeared somehow. It disappeared, and if you look at page 14 of the agency's brief, a footnote 5, it says the discussion of burden to which PHH refers to is in a section of the decision that addresses an alternative theory of liability, a theory that was relied on by the ALJ but that did not form the basis of the director's decision. That's as clear as it could be. That was a position that may have been in the ALJ's thinking, but it was abandoned by the director and it was abandoned by the agency in the briefs that are filed in this court. So that is not before this court. This is a clear interpretation of the statute that if you read the language of the statute, you don't have to do anything else, but you not only have the language of the statute, but you have the interpretation that was uniformly followed for years and years and years. Then the defense that the agency puts forward is we have something in our regulation saying don't trust us. Any agency can put that out there, put a warning label on the front of this agency, and by the way, it should be on the front of this agency, don't trust us, because that does not exonerate them from the due process clause of the Constitution, which requires fair warning that an individual that is going to be subject to regulations must have a basis with ascertainable certainty. That's the Christopher v. Smith fine case, another United States Supreme Court decision, and I don't have to repeat for this court, again and again and again decided by the Supreme Court, that an individual who is going to be subjected to a substantial penalty or any fine or anything like that has to have the opportunity for ascertainable certainty as to what is prohibited and what is not. The statute of limitations issue is another thing that is really quite remarkable on what the agency has done. Section D of the statute specifically says that proceedings for violation of this section by the Bureau, this refers specifically to the Bureau, shall be brought pursuant to this section, and then Section 201-4 says any action pursuant to the provisions of Section 2008-2608 of this statute shall be subject to this statute of limitations. So it is quite clear in Section 8 in the statute itself that an action brought by the agency, which is what was brought here. Now, what the agency is now saying, well, the word action doesn't mean such we do. It only means if we go to court. Well, you can't find that in the statute anywhere. What they brought was an action pursuant to Section 8D, and actions brought pursuant to Section 8D are subject to Section 2014. So that statute of limitations is right there. So the fact is that this agency, and I won't spend any more time with respect to the systematic violations of clear provisions of the statute, clear agency provisions, clear court decisions with respect to the interpretation of the statute. Out of the blue, a $109 million penalty brought down on this agency, this industry, this company, that was pursuing a legitimate activity, charging reasonable fees for services. It's in the briefs. They paid out $156 million in claims. We hear that reinsurance is some kind of a racket. It's a very profitable thing as long as there's not a disaster. As soon as there's a disaster, then the insurance companies have to pay a lot of money, and the people that bought insurance, and there's testimony in this record that the lenders were saying, well, thank God, that sort of saved us, because when the housing market went to pieces in 2008, all of a sudden, all of a sudden, in a handbasket, all of a sudden that reinsurance was very valuable. There were premiums charged and profits made, and by any other industry, particularly an insurance industry, you make money until a disaster occurs. When a disaster occurs and there isn't any doubt that a disaster in the housing industry occurred, this company paid out $156 million in claims. $85 million went into trust funds for claims here, and then this disgorgement took the entire premiums to say it's all unjust enrichment. It wasn't all unjust enrichment. That came out of the blue, too, so that's another thing that's wrong, and this goes back to the constitutional questions. We're told that there are single-director agencies. Yes, there are, but they're very limited. We were criticized just a moment ago for suggesting that a holistic approach to separation of powers is appropriate. Morrison v. Olson, that is what the Supreme Court of the United States did, is apply a holistic approach and talk about the fact that the independent counsel there was appointed to a limited term for a limited purpose, and whether or not that decision is right or wrong in retrospect, there was a very careful constraint by the Supreme Court of we have to look at the entire picture. Well, let's look at the entire picture in this case. You have an agency run by a director that doesn't have to consult with anybody else. The FTC and some of those other agencies can only have three people from one party in the agency. There's a division of authority. There's separation. There's appointments at various different times. So this is all power concentrated in one person. The president does not have the power to remove except for inefficiency, malfeasance, or some violation of the law or something like that. The president can't remove this individual. The next president can't until his term is over. If there can't be an appointment, he continues on. He doesn't have to go to Congress with respect to his funds. He doesn't have to consult with the executive branch with respect to communications of Congress. He can hire people in ways that are independent of restrictions on federal employees and can hire people and can set their salaries. If you wanted power to run this country, and this agency took over the responsibility of something like a score of different other agencies with statutes all the way across the book. So it's very broad authority. It's not like the Social Security Commission. It's not like the FHFA, which is a limited degree of authority. You must share it with the Board of Advisors, including the head of the Treasury and the Secretary of Treasury and so on and so forth, and a limited scope with respect to the GSEs. But this is a very broad grant of authority over many, many different statutes to one individual who doesn't have to pay any attention to the president or the Congress, can do anything he wants. And what we see here is a violation systematically of statute after statute after statute to impose a $109 million penalty out of the blue on this industry, this company, that was following the law. That is unconstitutional. It's an unconstitutional agency, and the steps that were taken are unconstitutional. The decision of this director cannot be upheld. The decision must be vacated, and I do hope that the court will weigh in on these statutory violations, because it's very, very important to this entire industry. Reinsurance is a very legitimate business. It is very important to certain people. The existence of reinsurance is not against the law. It's not prohibited by RESPA, and referrals are not prohibited, only where there is not compensation for actual services. So it's very, very important that the court pronounce where there's a violation of the statute by this director, there was a violation of the statute, and the director who was appointed by the president pursuant to a provision that we submit is unconstitutional. He cannot hold that job. You cannot strip the removal provisions and then say, go back and keep doing it, because he was appointed to a position that had those removal restrictions on it.  He cannot hold that office. Someone else will have to be appointed to an agency that Congress should come back and create in a constitutional way. Thank you. Thank you, counsel. Thank all counsel for excellent briefs and arguments, including all the amicus briefs, which were very helpful. Case is submitted.
judges: Henderson, Kavanaugh, Randolph